Elaine C. MOTTA

v.

Larry R. MEACHUM.

No. 3:93 CV 2423 (JGM).

United States District Court,
D. Connecticut.

May 15, 1997.

Rebecca M. Vicente, Soycher & Winslow, Bloomfield, CT, Judith D. Meyer, Avon, CT, for plaintiff.

Margaret Quilter Chapple, Sharon M. Hartley, Terrance M. O'Neill, Attorney General's Office, Hartford, CT, for defendant.

## MEMORANDUM OF DECISION

MARGOLIS, United States Magistrate Judge.

On December 7, 1993, plaintiff Elaine Motta commenced this action pursuant to the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.* ["the Act"], against defendant Larry Meachum, claiming defendant discriminated against her on the basis of her disabilities and failed to provide reasonable accommodations to permit her to perform her job. Plaintiff amended her complaint on June 13, 1995. (Dkt.# 35).

This file was referred to this Magistrate Judge for all proceedings on August 28, 1995. (Dkt.# 36). The parties consented to proceed to trial before this Magistrate Judge on October 27, 1995. (Dkt.# 38). On May 20, 1996, the parties filed a forty-one-paragraph Stipulation of Facts and Law ["Stip."]. (Dkt.# 47, § 5, ¶¶ A–Z, AA–HH.1–7).[1] A court trial was held for five days, on May 28–31, 1996 and June 4, 1996. (Dkt.# # 49–58).[2] On July 22, 1996, defendant filed his post-trial brief. (Dkt.# 65). On July 22, 1996, plaintiff filed her proposed findings of facts and post-trial brief. (Dkt.# # 66–67). On August 27 and 29, 1996, defendant and plaintiff, respectively, filed their reply briefs. (Dkt.# # 71–72).

For the reasons stated below, judgment shall enter for defendant.

## I. FINDINGS OF FACT

The following constitutes the court's findings of fact, pursuant to Fed.R.Civ.P. 52(a):

At all times relevant to the complaint, defendant Larry R. Meachum was Commission-

1. To the extent that a fact is mentioned in the Stipulation, no further reference will be made to the various transcripts.

2. The parties did not order the transcripts by day, as is customarily done, but instead by witness, which resulted in having ten small transcripts. The transcripts filed are as follows: testimony of plaintiff Elaine Motta on May 28, 1996, filed June 17, 1996 (Dkt.# 59)["Motta 5/28/96 Tr."]; testimony of plaintiff Elaine Motta on May 29, 1996, filed June 17, 1996 (Dkt.# 60)["Motta 5/29/96 Tr."]; rebuttal testimony of plaintiff Elaine Motta on June 4, 1996, filed June 17, 1996 (Dkt.# 61)["Motta 6/4/96 Tr."]; testimony of two witnesses, "W" and "S," taken in Chambers on May 29, 1996, filed under seal on August 21, 1996 (Dkt.# 73)["W & S Tr."]; testimony of Barbara Perun on May 29, 1996, filed August 21, 1996 (Dkt.# 70)["Perun Tr."]; testimony of Dr. Kent Stahl and Linda Rowan on May 30, 1996, filed on August 21, 1996 (Dkt.# 68)["Stahl & Rowan Tr."]; testimony of Sister Donna Hoff-

man on May 30, 1996, filed June 21, 1996 (Dkt.# 62)["Hoffman Tr."]; testimony of Maria Houser on May 31, 1996, filed June 21, 1996 (Dkt.# 63)["Houser Tr."]; testimony of Robin Nedjoika on June 4, 1996, filed August 21, 1996 (Dkt.# 69)["Nedjoika Tr."]; and testimony of Stuart Semple, Jeannette Talbert, and Carol Sullivan on June 4, 1996, filed June 21, 1996 (Dkt.# 64)["Semple, Talbert & Sullivan Tr."]. The parties did not request the testimony of Lorraine Turner. The deposition testimony of Dr. Kevin J. Kiwak was introduced as Joint Exh. 1.

Dr. Stahl, Sister Donna, Maria Houser, and Dr. Kiwak (through his deposition transcript) appeared as jointly designated witnesses. Plaintiff's additional witnesses were herself, W, S, Barbara Perun, and Lorraine Turner; defendant's additional witnesses were Linda Rowan, Robin Nedjoika, Stuart Semple, Jeannette Talbert, and Carol Sullivan.

er of Corrections of the State of Connecticut, and was the chief executive officer of the Connecticut Department of Corrections ["DOC"] with the ultimate authority for the hiring, promotion, transfer and training of all employees within the DOC; he further was responsible for controlling and supervising all operations and facilities of the DOC. (Stip.¶ B).

Plaintiff Elaine C. Motta began working for the DOC in or about August 1991 as a Social Worker Trainee, and was assigned to the Hartford Correctional Center ["HCC"]. (Stip.¶ D). During this time period, HCC was classified as a Level IV facility. (Stip.¶ X). However, HCC also houses Level V inmates, who are "probably the most violent inmate[s] in the state." (Hoffman Tr. at 52–53). Level V inmates generally are housed on the third floor of the facility. (Hoffman Tr. at 65–67).

In her job application in July 1991, plaintiff reported that she was not handicapped. (Stip.¶ Y). When plaintiff began working for DOC, she was healthy and was not aware that she had any physical problems at that time. (Stip.¶ BB). Plaintiff was not required to undergo a preplacement physical examination. (Houser Tr. at 17–18, 31–32). Plaintiff held the position of Social Worker Trainee for six months, performing certain of the essential functions of a Correctional Rehabilitation Service Officer ["CRSO"], without attending any training in self-defense or in how to deal with physical confrontations with inmates. (Stip.¶ U). During this time period, plaintiff had direct daily contact with inmates, meeting with them in their cell blocks, counseling area, school library, and even in the hallways. (Motta 5/28/96 Tr. at 6–7). In December 1991, plaintiff completed a six-week training program at the DOC's Center for Training and Staff Development. (Stip.¶ Z). The training received by plaintiff included courses in basic security skills, conflict management, use of force, emergency procedures, chemical agents, disciplinary procedures, restraint devices, hostage negoti-

ation and survival, security skills, management of aggressive behavior, use of a 24–inch straight baton, cell extraction, defensive tactics, and assaults on officers. (Stip. ¶ AA. *See also* Exh. H; Houser Tr. at 112–14; Semple, Talbert & Sullivan Tr. at 6–9).[3]

In May 1992, plaintiff reviewed the exam announcement for a CRSO I position. (Stip.¶ CC). In August 1992, plaintiff was promoted to the position of CRSO I. (Stip.¶ E). Plaintiffs daily activities as CRSO included, *inter alia,* counseling inmates, preparing case files, coordinating court appearances and doctors' appointments for inmates, and overseeing inmates' progress within educational and/or rehabilitative programs. (Stip. ¶ R. *See also* Exh. K). Plaintiff's job duties as a CRSO I at HCC included a "moderate" amount of walking and stair climbing. (Stip.¶ V). At the time, HCC had three floors and no transportation elevator; plaintiff routinely used the stairs to the second or third floors of the facility approximately two or three times in an average day. (Stip. ¶ W. *See also* Exh. 1 (under seal); Exh. F; Motta 5/28/96 Tr. at 11–27, 32–34; Motta 5/29/96 Tr. at 56–57, 58–69, 71–72, 76–83, 126–27, 128–30; *cf.* Hoffman Tr. at 8–9, 20–23, 27–28, 29–32, 44–46, 57–60; Semple, Talbert & Sullivan Tr. at 78–79, 80–83). Prior to her illness, plaintiff's average case load was "about 120" inmates,' although she estimated that she dealt with between twenty-five and a hundred inmates daily, in the administrative offices, counseling area, hospital area, hallways, and school. (Motta 5/2/96 Tr. at 76–77, 78–79).

One significant portion of plaintiff's responsibilities included the preparation of "objective classifications" for inmates, in which six or seven categories are analyzed by deriving information from the prison's computer, including severity of violence, escape risk, and vocational education of an inmate, to determine his overall risk score; usually this work was done in the administrative area of the prison, in which there is very limited

---

**3.** Motta received a score of 100 in this training, the highest grade given, and was the class valedictorian. (Exh. H; Motta 5/29/96 Tr. at 50; Houser Tr. at 114; Semple, Talbert & Sullivan at 17). Plaintiff's instructions were delayed be-

cause between 1989 and 1995, DOC was hiring approximately 1,000 people per year and the academy could not "keep up" with the pace. (Houser Tr. at 114–15).

contact with prisoners. (Motta 5/28/96 Tr. at 27–32, 77–78; Motta 5/29/96 Tr. at 69–70; Stahl & Rowan Tr. at 126–27; Houser Tr. at 70–72). Upon cross-examination, plaintiff was insistent that a counselor did not need to meet face-to-face with an inmate in order for him to review and sign his objective classification. (Motta 5/29/96 Tr. at 70–71).[4] There were two CRSO's at HCC whose primary assignments were the preparation of objective classifications—Michael Carter and Sister Donna Hoffman. (Motta 5/28/96 Tr. at 31–32, 46; Motta 5/29/96 Tr. at 85–87; Stahl & Rowan Tr. at 127–28; Hoffman Tr. at 3–7). Plaintiff estimated that approximately sixty percent of her time was spent on purely administrative matters which could be performed in the front offices. (Motta 5/28/96 Tr. at 76–77).[5]

When plaintiff visited inmates in the residential areas, such as the tiers or dormitory, she would wear a body alarm provided to her by an officer in the center control area. (Motta 5/28/96 Tr. at 34–36; Motta 5/29/96 Tr. at 74). Plaintiff also utilized a body alarm which was effective only in the counseling area. (Motta 5/28/96 Tr. at 36; Motta 5/29/96 Tr. at 73–74. See also Hoffman Tr. at 25 (telephone in counseling area also serves as an alarm)). At the time, there were approximately nine to twelve CRSO's at HCC, who worked Mondays through Fridays, 8:30 a.m. through 3:45 p.m. (Motta 5/28/96 Tr. at 41; Stahl & Rowan Tr. at 116–17; Hoffman Tr. at 9–10; Semple, Talbert & Sullivan Tr. at 46). As previously mentioned, two worked exclusively in the administrative offices, four had offices in the dormitories, and the rest, including plaintiff, had offices in the counseling area. (Motta 5/28/96 Tr. at 42; Motta 5/29/96 Tr. at 71–72; Hoffman Tr. at 33–36). Plaintiff agreed, upon cross-examination, that one of the essential elements of being a counselor is the ability to meet face-to-face with the inmates being counseled, to derive "a feel" and "an understanding" for the inmates and their requests. (Motta 5/29/96 Tr. at 66–67). Sister Donna agreed that speaking and listening to inmates is "the most important function of the counseling job," which can take approximately seventy to eighty percent of a counselor's time. (Hoffman Tr. at 20–23. See also Hoffman Tr. at 39–40).[6] Sister Donna was not aware of any correctional counselor who had no inmate contact. (Hoffman Tr. at 49–50). Sister Donna testified that there were eight counseling offices off a larger reception area; on a given day, there could be as many as thirty to fifty inmates in this vicinity, usually without correctional officers present. (Hoffman Tr. at 33–36, 37). Sister Donna further estimated that as much as ninety to ninety-five percent of a counselor's contacts with inmates takes place outside the presence of correctional officers. (Hoffman Tr. at 48–49. See also Houser Tr. at 112). Even Level V inmates are brought to the counseling area, and can be left unaccompanied by a correctional officer. (Hoffman Tr. at 53).

During her career as a CRSO I, plaintiff never restrained an inmate, plaintiff was never physically attacked by an inmate, and she never saw or heard of another counselor physically attacked or in a physical confrontation with an inmate. (Motta 5/28/96 Tr. at 8, 40–41; Motta 6/4/96 Tr. at 12). In November 1992, plaintiff first learned that her job with DOC was considered "hazardous duty" when she received a "hazardous duty" bonus in the amount of her paycheck; she testified no mention was made of this at her interview for the job. (Motta 5/28196 Tr. at 8–9, 78; Motta 5/29/96 Tr. at 130–31).[7] According to

---

4. Sister Donna Hoffman's testimony was to the contrary, i.e., that the inmate was required under Administrative Directive 9.2 to sign a form that he recognized he was at a Level IV facility because of his factors. (Hoffman Tr. at 4–5, 36–37, 60–62).

5. Sister Donna's estimate was much lower, in the vacinity of twenty to thirty percent. (Hoffman Tr. at 6–7, 16, 32–33).

6. Sister Donna acknowledged that she spent more time in the unsecured portion of HCC than did other counselors. (Hoffman Tr. at 56–57).

7. Plaintiff agreed upon cross-examination, however, that she initialed documents in her personnel file with respect to retirement, which indicated that as a hazardous duty employee, she was entitled to retire after twenty years of service. (Exh. B; Motta 5/29/96 Tr. at 131, 132–34; see also Semple, Talbert & Sullivan Tr. at 20–21, 24–25).

a pension agreement between the State Employees' Bargaining Coalition and the State of Connecticut, dated January 17, 1990, a CRSO I position is designated as a hazardous duty position. (Exh. G; Houser Tr. at 160–61, 164).

Plaintiff testified that when a "Code 7" alarm or "all available call" is sounded, all available correctional officers are to respond, not correctional counselors. (Motta 5/28/96 Tr. at 21, 36–39; Motta 5/29/96 Tr. at 72, 74–75, 88; Motta 6/4/96 Tr. at 9–10). Plaintiff recalled that there was "at least one all available call a day," perhaps more. (Motta 5/29/96 Tr. at 74, 88–89). Upon cross-examination, plaintiff agreed that one technique used by inmates to create a disturbance is to flood their toilets and sinks, resulting in slippery wet floors, or to spread baby oil or shampoo on the floors for that same purpose. (Motta 5/29/96 Tr. at 83–85).[8] Plaintiff also agreed that prisons "usually" are unpredictably dangerous places. (Motta 5/29/96 Tr. at 85).

In January 1993, plaintiff was diagnosed as having an arteriovenous malformation ["AVM"] in her lower spine, a congenital defect which required surgical correction. (Stip. ¶ F). Left untreated, this is a potentially life-threatening condition, which could result in paralysis or death. (Motta 5/28/96 Tr. at 45; Motta 5/29/96 Tr. at 93–94). Plaintiff began to use a cane on March 10, 1993. (Motta 5/28/96 Tr. at 44). At that point, plaintiff's physician requested "light duty" work for plaintiff; plaintiff was assigned to the front office preparing objective classifications, along with Sister Donna and another employee, Richard Yolken, who was wearing a neck brace. (Motta 5/28/96 Tr. at 45–46, 47–48).[9] During this period, from approximately March 10 to March 26, 1993, plaintiff had no inmate contact. (Motta 5/28/96 Tr. at 48–49).

Between March 1993 and June 14, 1993, plaintiff was required to undergo six surgical procedures to correct her spinal problem. (Stip. ¶ G. *See also* Motta 5/28/96 Tr. at 52–53, 55, 57–58). One of the earlier procedures left her temporarily paralyzed. (Motta 5/28/96 Tr. at 50–51). As a result of the AVM, plaintiff suffers from a total left foot drop, and wears a brace on her left leg to correct the foot drop; without the orthotic device, plaintiff's ability to walk is significantly limited, despite intensive inpatient and outpatient physical therapy. (Stip. ¶ H; Motta 5/28/96 Tr. at 58–62, 65–67; Motta 5/29/96 Tr. at 99–100). Plaintiff "was off" the DOC payroll by June 1993. (Motta 5/28/93 Tr. at 86).

On July 15, 1993, plaintiff's physician, Dr. Bennett Stein, noted that "[t]here is no question that [plaintiff] has a long term disability problem and I don't anticipate her going back to the type of work that she did before, certainly in the near future." (Stip.¶ DD). On July 20, 1993, Dr. Stein, in a letter to Dr. Kevin Kiwak, plaintiff's neurosurgeon, wrote that "I think in the long run [plaintiff] will have to change her job situation." (Stip. ¶ FF). Jeanette Talbert, Personnel Officer at HCC, testified that during this time period, plaintiff provided her with the proper medical documentation for her sick leave. (Semple, Talbert & Sullivan Tr. at 19, 25–26).

On or about August 22 or 23, 1993, plaintiff placed a telephone call to Linda Rowan, Warden of HCC,[10] to discuss plaintiff's return to

---

"Hazardous duty" is defined by statute and in collective bargaining agreements. (Exhs. 14–15, G; Houser Tr. at 36–41, 42, 43, 44–45, 156–59, 160–61). Houser testified that of the 7,500 DOC employees, approximately four-fifths of them are considered "hazardous duty" employees. (Houser Tr. at 96).

**8.** Sister Donna testified that the floors at HCC are "very slippery," because the DOC takes pride in having them shine and the building "sweats," so that the floors are "dampish"; Sister Donna estimates that she had fallen "at least" six to eight times. (Hoffman Tr. at 52, 65, 69–70).

Sister Donna remembered an incident when the whole center wing was flooded by inmates. (Hoffman Tr. at 70–71).

**9.** Sister Donna did not remember Yolken. She did remember one other correctional counselor who had knee surgery, who spent two weeks doing objective classifications. (Hoffman Tr. at 26–27).

**10.** Warden Rowan has extensive experience within the DOC. (Stahl & Rowan Tr. at 109–10). She never worked with plaintiff, because plaintiff already was on medical leave when Warden

HCC. (Motta 5/28/96 Tr. at 65; Motta 5/29/96 Tr. at 106; Stahl & Rowan Tr. at 111–12). Warden Rowan assured plaintiff, "Don't worry, we're not going to give your job away . . . until you're recovered." (Stahl & Rowan Tr. at 114). Talbert agreed that plaintiff's position had remained open for her upon her full recovery. (Semple, Talbert & Sullivan at 45–46). As plaintiff poignantly testified:

I was tired of being sick. I was feeling better. I wanted to feel better now. . . . I wanted it to happen now. I wanted to get myself back together so I could go back to my life.

. . .

I really wanted to go back to work.

. . .

I really wanted to be Counselor Motta again. I missed the people that I worked with. I missed the inmates. I missed the satisfaction that I got from seeing my inmates and having them ask me a zillion different things, and I gave them all the answers on that day. That was what made me happy.

(Motta 5/28/96 Tr. at 67). Warden Rowan scheduled a meeting with plaintiff for September 7, 1993. (Motta 5/28/96 Tr. at 68; Stahl & Rowan Tr. at 112).

On September 7, 1993, plaintiff met with Warden Rowan and Talbert; at this meeting, plaintiff indicated that she would be ready to return to work on October 1, 1993, but must limit her physical activity, including walking, stair climbing, standing and lifting. (Stip. ¶ J). On that date, plaintiff was using a cane and an ankle/foot orthotic to assist her in walking. (Stip.¶ K). At that point, plaintiff was undergoing intensive rehabilitation, had climbed down a flight of stairs at her home in order to drive herself to this meeting, and used the cane only "for a little reassurance, . . . like Linus has his blanket for comfort and protection." (Motta 5/28/96 Tr. at 69–71; Motta 5/29/96 Tr. at 106, 108, 110–11; see also Exh. 2). Plaintiff provided Warden Rowan and Talbert with a letter, dated August 25, 1993, from Dr. Stein, which indicated

that "when she [plaintiff] is able to return to her employment, it will have to be light duty with limited physical activity and limited walking, standing, lifting and bending." (Stip. ¶ I; Exh. 2; Motta 5/28/96 Tr. at 68–69; Motta 5/29/96 Tr. at 107, 108–09). Plaintiff requested that she be assigned to housing units on the first floor of HCC, because "[a]t that time, [she] was not comfortable doing stairs," that she work primarily within the administrative offices, and that she be allowed to use a cart within the administrative offices to transport her files. (Motta 5/28/96 at 72–76; Motta 5/29/96 Tr. at 115–16; Stahl & Rowan Tr. at 113). Plaintiff was the person who identified October 1, 1993 as the appropriate day for her to return to work. (Motta 5/29/96 Tr. at 109–10).

Warden Rowan testified that she expressed concerns about plaintiff's ability to travel within the facility, particularly because Warden Rowan had ordered that the records office be moved "back inside where I believe it belonged, near the counselors." (Stahl & Rowan Tr. at 113–14).[11] Plaintiff left the meeting with "the distinct impression that they were going to work on the accommodations and that they would be in touch with me." (Motta 5/28/96 Tr. at 78, 73). Warden Rowan testified, in contrast, that she had made no promises to plaintiff other than that DOC "would not give her job away until we had some documentation from [plaintiff's] doctor that she was able to return to duty." (Stahl & Rowan Tr. at 114). Talbert similarly testified that she reminded plaintiff of her obligation to provide medical documentation which would allow her to return to full duty, not limited duty. (Semple, Talbert & Sullivan Tr. at 27, 28–29, 29–30, 49–50, 51–52).

Plaintiff further testified that she exchanged pleasantries with Sister Donna and others in the hallway. (Motta 3/28/96 Tr. at 71–72). Upon cross-examination and rebuttal, she denied having instructed Sister Donna not to hug her, because she could become paralyzed, or having given a similar warning to Warden Rowan and Talbert. (Motta 5/29196 Tr. at 111–12; Motta 6/4196 Tr. at

Rowan was appointed warden In 1993. (Stahl & Rowan Tr. at 110–11).

11. While Warden Rowan was assigned to HCC, the records office was never moved back inside the facility. (Stahl & Rowan Tr. at 126).

3).[12] In contrast, Sister Donna, which whom plaintiff was "friendly," testified when her put her arm around plaintiff, Motta instructed her, with "a frightened look on her face": "Don't touch me. Don't press on my back because I could be paralyzed." (Hoffman Tr. at 43, 46–48). Sister Donna emphasized that there was "no possible way" she misunderstood plaintiff, because "I remember her face." (Hoffman Tr. at 62–63). Warden Rowan testified that plaintiff was "very hesitant" about having people putting their arms' around her, as plaintiff indicated that if she fell or was shoved, she could "be in a wheelchair for the rest of her life." (Stahl & Rowan Tr. at 112–13). Talbert similarly testified that she saw Sister Donna embrace plaintiff and heard plaintiff instruct Sister Donna not to, because she could be paralyzed. (Semple, Talbert & Sullivan Tr. at 29, 36, 44).

Having heard nothing further from HCC, on September 27, 1993, plaintiff contacted Talbert and indicated that she wanted to return to work on October 1, 1993; Talbert responded that plaintiff must obtain a letter from her doctor before she could return to work. (Stip.¶ L). During this conversation, plaintiff did not indicate that her condition had improved since their prior meeting. (Stip.¶ EE). That same day, plaintiff obtained and provided Talbert with a letter from Dr. Stein, which letter stated that plaintiff "may return to work on 10/1/93 with limited physical activity, limited walking, standing and no lifting." (Stip. ¶ M; Exh. 2). At that time, plaintiff "intend[ed] to return to work, . . . to do the essential functions of the job with a few accommodations." (Motta 5/29/96 Tr. at 121). As previously mentioned, the accommodations were to meet with inmates on the first floor of the facility. (Motta 5/29/96 Tr. at 122–23, 124). Plaintiff believed that Dr. Stein's September 27th letter permitted her to interact with inmates without the supervision of correctional officers. (Motta 5/29/96 Tr. at 135).

Within one or two days, Talbert informed plaintiff that she could not return to work,

because the DOC had no permanent light duty positions. (Motta 5/28/96 Tr. at 79–81). Plaintiff thereafter contacted Talbert, Warden Rowan, Linda Davis, and Carol Sullivan, DOC's Region 3 Personnel Manager, who is Talbert's immediate supervisor. (Motta 5/28/96 Tr. at 82–83, 84; Semple, Talbert & Sullivan Tr. at 58, 60–61). Sullivan's response was the same, namely that plaintiff could not return to HCC because the DOC had no permanent light duty positions. (Motta 5/28/96 Tr. at 84; Semple, Talbert & Sullivan Tr. at 62–63). Defendant's decision not to permit plaintiff's return had been made in September or October 1993 by Maria M. Houser, DOC's Agency Personnel Administrator. (Stip. ¶¶ O, GG; see also Stahl & Rowan Tr. at 117, 125–26; Houser Tr. at 2, 3, 92–93, 94–95, 95–96). Defendant's refusal to allow plaintiff to return to her former position as a CRSO was based upon a decision that due to her physical limitations regarding walking, stair climbing, lifting and bending, she did not meet the physical requirements for the position and she posed a safety risk to herself and others. (Stip.¶ P). Defendant's practice and policy are to refuse permanent requests for light duty positions to hazardous duty employees requesting such positions due to physical limitations. (Stip.¶ Q). Houser and Sullivan emphasized that DOC has never accommodated a hazardous duty employee or permitted a hazardous duty employee to return to permanent employment with physical limitations. (Houser Tr. at 21–22, 37, 49–50, 53–54, 98, 115, 116–17, 117–18; Semple, Talbert & Sullivan Tr. at 64–65, 76). DOC is willing to place employees with medical problems in "a recuperative post" for no more than ninety days "until they're cleared for full duty"; this was a term negotiated in the applicable collective bargaining agreement. (Houser Tr. at 116, 166–68, 172–72, 177–80. cf., Exh. 19). Plaintiff did not qualify, however, for such a position. (Houser Tr. at 170–71). Houser estimated that approximately four to six DOC employees each year are not allowed to return to hazardous duty work because of permanent injury or medical condition. (Houser

---

**12.** Plaintiff's deposition testimony apparently was to the contrary. (Motta 5/29/96 Tr. at 112– 113).

Tr. at 118). Houser testified that of the approximately 350 correctional counselors employed by DOC, all of them had inmate contact. (Houser Tr. at 101). Houser further testified that had plaintiff presented medical documentation clearing her for return to work without restriction, plaintiff would have been returned to her previous position. (Houser Tr. at 130). Ironically, on or around October 1, 1993, the DOC issued a job specification for "correctional counselor," which replaced CRSO I and CRSO II positions; Houser testified that she "had been working on [this project] for several years before it became effective." (Exhs. 11 & E–F; Houser Tr. at 12–15, 3–7, 63–66, 101, 104–07, 108–09, 110–11, 111–12).

Contrary to plaintiff's testimony, several witnesses from DOC, including Warden Rowan, Sister Donna, and Stuart Semple (who is Acting Captain of the Center for Training and Staff Development), testified that when an "all available" alarm is sounded, all hazardous duty employees, including correctional counselors, are to respond. (Stahl & Rowan Tr. at 110; Hoffman Tr. at 14–15, 51–52; Semple, Talbert & Sullivan Tr. at 2, 14–15). Sister Donna estimated that there could be two to four "all available" alarms sounded per shift. (Hoffman Tr. at 50–51). Warden Rowan considers correctional counselors to be "direct line" personnel, who, like correctional officers, can have actual custody of an inmate or inmates. (Stahl & Rowan Tr. at 114–15). In her opinion, a person could not perform the job of a correctional counselor at HCC and have no direct inmate contact. (Stahl & Rowan Tr. at 116). Warden Rowan testified that she could not accommodate plaintiff, because at HCC there are no areas, even in the records office, where inmates are not present. (Stahl & Rowan Tr. at 120–21). Upon cross-examination, however, Warden Rowan agreed that there never has been a violent incident in the front office area at HCC. (Stahl & Rowan Tr. at 121–23). Sister Donna testified, however, that on three occasions, she was required to physically restrain inmates involved in an altercation or during a riot situation. (Hoffman Tr. at 10–15). She also testified that on three occasions, she has been threatened by inmates, although she did not prepare incident reports on all of them.

(Hoffman Tr. at 53–54, 64–65, 67–68, 69). Sister Donna further testified that the psychiatric patients in HCC's hospital pose a threat for counselors, as these inmates are entitled to counseling services as well. (Hoffman Tr. at 54–55). Semple testified that correctional counselors are considered "direct-contact employees," in that they have "in most instances" daily contact with prisoners, with unpredictable exposure to hazards. (Semple, Talbert & Sullivan Tr. at 2, 6–9, 13–14, 15, 16–17, 17–18). Houser testified that from July 1991 though August 1994, there had been only one instance at HCC in which a correctional counselor was involved in physically restraining an inmate, quelling a disturbance, or otherwise assisting security forces in an emergency, and for the remaining correctional facilities, there had been six such incidents at Niantic Correctional facility, eight at the Somers facility, nine at the Carl Robinson facility, three at the Enfield facility, and three at the Webster facility. (Houser Tr. at 73–78, 79–82, 83–89, 90–91; see also Exhs. 17–18).

DOC did not request any further tests, letters, or clarification from Dr. Stein, nor did plaintiff, on whom the ultimate responsibility rested, present any new documentation. (Motta 5/28/96 Tr. at 85–86; Houser Tr. at 48–49, 50–53, 60–61,130, 156). On October 1, 1993, plaintiff wore a brace on her left leg in order to be able to walk, was significantly limited in her ability to walk and to climb stairs, and could not lift anything weighing more than five pounds. (Stip.¶ N). Warden Rowan testified that some time around October 1, 1993, plaintiff reported for duty, walking without a cane; although plaintiff exhibited improvement, both physically and emotionally, she still walked with "a noticeable limp, and ... a 'hitch' in her gait." (Stahl & Rowan Tr. at 117). Warden Rowan reminded plaintiff that before she would allow plaintiff to return to work, plaintiff needed documentation from her physician that she could return to duty "without restriction," and not on "limited duty." (Stahl & Rowan Tr. at 118–20). On cross-examination, plaintiff did not recall having reported to her physical therapist on October 20, 1993 that she was experiencing spasms in her left

leg, which caused her to fall down. (Exh. A; Motta 5/29/96 Tr. at 100, 103, 110, 116). She did not deny, however, that in late October 1993 she "was experiencing leg spasms that were causing [her] leg to twitch," and that she "possibly . . . fell once or twice." (Motta 6/4/96 Tr. at 10).

Prior to March 1994, including fall 1993, defendant never requested that plaintiff submit to any physical examination, nor did DOC employees discuss with any medical expert plaintiff's physical condition or limitations. (Stip. ¶ S; Houser Tr. at 18, 21–23). On March 9, 1994, upon defendant's request, plaintiff submitted to a medical examination by Dr. Kent Stahl, a physician selected by DOC. (Stip. ¶ T; Exh. 6; Stahl & Rowan Tr. at 16). Dr. Stahl is an internist whose business at that time performed all of the physical examination for DOC and who has served as an expert for DOC in unrelated proceedings. (Exh. C; Stahl & Rowan Tr. at 2–5, 7–9, 10–11, 87–89). Dr. Stahl testified that he based his findings on his own independent examination, and not on the expectations of DOC. (Stahl & Rowan Tr. at 89, 90).

At the time of this examination, Dr. Stahl knew that plaintiff had commenced litigation against defendant. (Exh. 6; Stahl & Rowan Tr. at 11–13, 53). Prior to the examination, Houser had provided Dr. Stahl with information regarding the job specifications of a correctional officer and a correctional counselor and Dr. Stahl was familiar with a Med–Tox study, which serves as a "guideline." (Exh. 9; Stahl & Rowan Tr. at 16–22, 24–25, 26–27, 28–30, 31–33, 34–35, 36–37, 40–41, 42–43, 48–49, 50–52, 52–53, 90–91, 92–93, 94–97, 98, 107–08; Houser Tr. at 23–24, 24–25, 26). Prior to the examination, Dr. Stahl also had reviewed the records from plaintiff's surgery, as well as the medical records of Gaylord Hospital, Dr. Stein, and Dr. John Pile–Spellman, a neurosurgeon in New York with expertise regarding AVM's. (Exh. 6; Stahl & Rowan Tr. at 53–54, 99–100). Dr. Stahl noticed that plaintiff had a "pronounced limp," that "there was a clear weakness of the muscle of dorsiflexion of . . . the left foot,"

and that her leg stretch of 120 pounds of lift was "acceptable." (Exh. 6; Stahl & Rowan Tr. at 54–55, 55–58, 74–75). Plaintiff described the examination as very brief, and Dr. Stahl never requested that plaintiff run in his presence. (Motta 5/29/96 Tr. at 35–37; Stahl & Rowan Tr. at 64, 65–66, 67–68, 69–71).[13]

In a letter, dated March 16, 1994, Dr. Stahl observed that plaintiff was unable to run, could sustain a fast walk without difficulty, had difficulty on stairs, could ascend and descend stairs at slow to moderate speeds with concentration and would be expected to have difficulty if attempted at rapid speed, had difficulty with balance, and would be expected to fall in a situation which required sudden and rapid change in posture. (Exh. 6; Stahl & Rowan Tr. at 41, 75–77, 80, 99–106). Dr. Stahl's conclusions with respect to stair climbing and balance came from his review of the Gaylord Hospital reports from early July 1993, as he did not observe plaintiff on stairs or test her specifically for balance. (Stahl & Rowan Tr. at 58–63, 75–79). The doctor did agree, however, with Dr. Stein's description of plaintiff's recovery, "under the circumstances" as "amazing," but she nonetheless still was left "with deficits which allow pretty good function in most situations, but are significant in terms of direct inmate contact positions." (Exh. 6; Stahl & Rowan Tr. at 71, 72–74, 106–07). Dr. Stahl perceived his role as the "assess[ment of any] physical deficits associated with [plaintiff's] condition and . . . [the] project[ion of their] impact on functional abilities," and not an opinion on whether plaintiff could perform the essential functions of her job or the consideration of reasonable accommodations. (Stahl & Rowan Tr. at 79–80, 47–48). Plaintiff testified that she had no knowledge of whether Dr. Kiwak, Gaylord Hospital, Dr. Stein, or Dr. Pile–Spellman ever contacted DOC. (Motta 6/4/96 Tr. at 11).

From October 1993 through June 1994, DOC made several efforts to find other employment opportunities for plaintiff both within DOC and other state agencies.

---

**13.** Sister Donna testified that she was never tested for running either; she can run a mile in about eighteen minutes. (Hoffman Tr. at 19–20).

(Stip.¶ HH). In October 1993, Talbert discussed with plaintiff several job possibilities for her continued employment with DOC; Talbert also provided plaintiff with an announcement for examinations which are on continuous recruitment and submitted a request to the Department of Administrative Services ["DAS"] to ask that such agency perform a search for less arduous work on plaintiff's behalf. (Stip.¶ HH.1).[14] On or about October 19, 1993, Talbert sent a letter to DAS, requesting that the agency explore the possibility that plaintiff be transferred to a less arduous position, as provided in the State Personnel Act, Conn. Gen.Stat. § 5-244. (Stip.¶ HH.4). That same day, Talbert also wrote plaintiff a letter regarding other employment options within the DOC; plaintiff testified that she never saw this letter until she reviewed her personnel file at HCC. (Exh. 5; Motta 5/29/96 Tr. at 35). Houser had several conversations with Roy Dion, bureau chief at DAS, regarding trying to find positions with other state agencies for plaintiff and DOC employees who were not able to continue in hazardous duty positions. (Stip.¶ HH.6).

In October and November 1993, Sullivan spoke with plaintiff on four occasions regarding her employment situation. (Stip.¶ HH.2). At Houser's request, Ana Scott, DOC's Affirmative Action Officer, also spoke with plaintiff on more than one occasion, regarding finding alternate employment for plaintiff. (Stip. ¶ HH.5; Houser Tr. at 54–55, 59–60). On November 11, 1993, plaintiff was offered a position as a Clerk in the records office at the MacDougall Correctional Institution ["MacDougall"]; plaintiff accepted the offer and began that job on November 26, 1993. (Stip.¶ HH.3). As the title suggests, the job was clerical in nature, and plaintiff felt "demeaned, inferior, worthless," and "[h]umiliated, degraded, inferior." (Motta 5/28/96 Tr. at 95; Motta 5/29/96 Tr. at 43). Plaintiff worked in the records office on the second floor and came in direct contact with the eight to ten inmates who performed janitorial services there. (Motta 5/29/96 Tr. at 11–13). At MacDougall, plaintiff worked alongside Robin Nedjoika, who assisted her when plaintiff was unable to reach files in less accessible locations. (Nedjoika Tr. at 2–3, 6–7). She described plaintiff's gait as "[s]low, cautious, hesitant." (Nedjoika Tr. at 5). Nedjoika also testified that she had seen plaintiff "crying, looking angry and upset." (Nedjoika Tr. at 7–8).

While at MacDougall, plaintiff observed another CRSO, "W,"[15] who walked with a limp on the left side of his body and who appeared to have difficulty using his left hand. (Motta 5/29/96 Tr. at 4–5; Motta 6/4/96 Tr. at 4). W testified in Chambers.[16] W has been employed as a correctional counselor with DOC for a relatively short period of time; he underwent an ordinary physical prior to his employment with DOC. (W & S Tr. at 15–18, 24–25). At an earlier time, W had a serious medical problem, which he was reluctant to discuss; he described the permanent effect of this problem as producing "a slight loss of dexterity on [the] left side of [his] body," including his arm and leg, with a "[s]light limp." (W & S Tr. at 18, 19–22, 26, 27, 28, 29–30, 31). He does not recall if his condition was discussed during his physical examination. (W & S Tr. at 21). W does not believe that he has any ongoing physical impairments, does not consider himself to be disabled, is not treated by DOC as if he is disabled, is able to move all about MacDougall without limitations, and is "[a]bsolutely" qualified to be a correctional counselor without any accommodation. (W & S Tr. at 25, 32, 33, 35–36). W continues to run daily, without unevenness. (W & S Tr. at 23–24; see also W & S Tr. at 16–17). Nedjoika also testified that she is familiar with W, and described him as walking "normal[ly]," with a "strut," rather than a limp. (Nedjoika Tr. at 8, 101–11).

---

14. Houser testified that she makes such requests "all the time," but that unfortunately, it can take DAS as much as one to three years to find alternative employment, given the "significant numbers of layoffs" in state personnel since 1991. (Houser Tr. at 121–22, 165).

15. This abbreviation is used to protect this officer's privacy, and the transcript has been redacted accordingly.

16. See note 18 infra.

At HCC, plaintiff had observed another employee, "D," [17] who, for three weeks, wore a leg brace, kept his leg elevated while sitting at his desk, and appeared to have difficulties ambulating. (Motta 5/29/96 Tr. at 7–9). A correctional officer who worked with plaintiff at HCC, "S," also testified in Chambers.[18] After two years of employment at HCC, S was seriously injured in an automobile accident on his way home from work; he suffered injuries to the right side of his body, including his dominant right arm, which sometimes "gets weak." (W & S Tr. at 39, 40–42). He testified that he can anticipate if this problem will occur when he awakes in the morning, and if so, would use an electrical device to "recharge" his arm, and if that fails, he makes an appointment with his doctor. (W & S Tr. at 42–44). S initially was not allowed to work while he required a "shoulder protector[ ] like the football players wear," but testified he had not missed one day of work in the six months prior to trial due to this injury. (W & S Tr. at 45–46). S acknowledged that sometimes the problem arises at work, but he uses the electrical device to correct the situation; that DOC has not required him to undergo any specific tests. (W & S Tr. at 46–50, 51–52, 53). Like W, S does not consider himself to be disabled or physically incapable of performing any task assigned to him. (W & S Tr. at 50).

Houser acknowledged that DOC has employed in hazardous duty positions one male employee with a prosthetic arm, a counselor supervisor or deputy warden (who has since retired) with a prosthetic leg, as well as a correctional commissary operator with a prosthetic leg. (Houser Tr. at 32, 33, 35, 45–47). Houser further recognized that there are some correctional counselors who perform objective classifications as the primary portion of their job, but that "[i]t depends on the counselor and the way that the warden or deputy warden runs that facility." (Houser Tr. at 70). She testified that the DOC employs individuals of "[a]ll sizes, ... shapes" and ages. (Houser Tr. at 72–73).

During her eight-month tenure at Mac-Dougall, from November 1993 until June 1994, plaintiff was able to descend a crowded stairwell quickly for a fire drill. (Motta 5/29/96 Tr. at 9–11). Plaintiff believes that she could have performed CRSO duties, as opposed to clerical work, while at MacDougall. (Motta 5/29/96 Tr. at 13). She believes that she "could have performed the essential functions of that job [with] no problem." (Motta 6/4/96 Tr. at 9). Plaintiff testified that as of October 1, 1993, she could run, although not as fast as before, and that the DOC never tested her for that. (Motta 5/29/96 Tr. at 13–14). She also testified that as of October 1, 1993, she could have used a nightstick and other self-defense measures, as she had been trained, although she did acknowledge on cross-examination that she was not as strong on October 1, 1993 as she had been in early 1993. (Motta 5/29/96 Tr. at 14–17, 124–26). Upon cross-examination, plaintiff agreed, however, that under DOC regulations, night sticks are to be carried only during a riot. (Motta 5/29/96 Tr. at 87–88). Plaintiff also testified, upon cross-examination, that she believes she would have been able to walk through HCC without using a cane, and agreed that it would not be appropriate for her to bring a cane into the prison, because it could be used against her as a weapon. (Motta 5/29/96 Tr. at 111. *See also* Hoffman Tr. at 41–42 (using a cane would be a sign of weakness and could be used against staff as a weapon)). When plaintiff saw Dr. Kiwak a week before trial, she complained of weakness in both her left and right legs. (Motta 5/29/96 Tr. at 138. *See also* Jt. Exh. 1(2)(May 21, 1996 entry)). Dr. Kiwak testified, however, that plaintiff was capable of resuming her "[n]ormal physical activities," and that plaintiff is not in any danger of sustaining injury as a result of her present condition. (Jt. Exh. 1, at 9, 10). Upon cross-examination, however, Dr. Kiwak acknowledged that plaintiff has weakness in her left leg, where she wears a dorsiflexion splint, she has "mild right thigh weakness," she is "somewhat limited" in her mobility, she "might" have difficulty in defending her-

---

**17.** *See* note 15 *supra.*

**18.** The testimony of W and S has been filed under seal. (Dkt.# 73).

self from a physical attack, and that she would have more difficulty in defending herself than would a person without her deficits. (Jt. Exh. 1, at 19–20, 22–23). Upon redirect examination, Dr. Kiwak agreed that a dorsiflexion splint would protect the leg and could "possibl[y]" increase kicking strength. (Jt. Exh. 1, at 23).

Plaintiff testified regarding a meeting she had with Houser in April 1994, when plaintiff was "crying hysterically, and it wasn't the kind of cry where you're sad and you're crying. It was the kind of cry that couldn't stop. It was an anger. It was a passionate cry that you just couldn't stop." (Motta 5/29/96 Tr. at 47). Houser agreed that during this meeting, "Elaine was very upset . . . She was crying. She was very emotional, very sad and very nervous. It took a while to calm her down." (Houser Tr. at 145). During this meeting, plaintiff requested a counselor's position in which she performed solely file reviews and consulting work; DOC's Deputy Commissioner rejected that request, on the advice of DAS, which would not permit a correctional counseling position without direct inmate contact. (Houser Tr. at 7–8, 8–11, 15–17, 144–47, 165–66). Plaintiff's request that she be accompanied by a guard whenever she met with violent inmates also was rejected, for obvious budgetary reasons. (Houser Tr. at 61–63). Houser "comforted" plaintiff and promised to continue to look at other job possibilities for her. (Motta Tr. at 47–48).

On several occasions, Houser contacted the Agency Personnel Administrator of DAS to request that plaintiff be considered for a social worker position with that agency. (Stip.¶ HH.7). Plaintiff had an interview with the Department of Children and Families, for a social worker position, which would entail physically removing children from their own homes, many of which were located in high-crime neighborhoods in Hartford; plaintiff described as "ridiculous" the notion that she was physically capable of performing such a job. (Motta 5/29/96 Tr. at 29–30, 31, 33, 34–35, 139. *See also* Houser Tr. at 124, 128).[19] Plaintiff began working as a social worker for DAS on or about June 23, 1994, and "loves" her job there. (Stip.¶ HH.7).[20] She feels "very fortunate" to have this job. (Motta 5/28/96 Tr. at 95–96).

For the period October 1, 1993 through June 22, 1994, plaintiff claims that she would have earned $25,494.52 as a CRSO I; she in fact earned $8,988.94 as a Clerk from November 26, 1993 through June 22, 1994, resulting in net lost wages after mitigation efforts in the amount of $16,505.58. (Exhs. 3–4; Motta 5/29/96 Tr. at 17, 18–20, 21, 23, 26–27, 28–29). Sullivan, however, testified that plaintiff's income as a CRSO I from October 1, 1993 through June 30, 1994 would have been $24,458.00. (Semple, Talbert & Sullivan Tr. at 73–74, 75). Sullivan further testified that from her review of plaintiff's payroll records, plaintiff earned $10,379 as a clerk at MacDougall. (Semple, Talbert & Sullivan at 73).

Plaintiff also seeks damages for her emotional distress. Plaintiff has suffered from depression, for which she has been seeing a psychiatrist and taking medication since 1991. (Motta 5/29/96 Tr. at 41–43, 94–96, 97–98. *See also* Exh. D (under seal)). Barbara Perun, plaintiff's roommate and "very close personal friend[ ]",[21] testified that plaintiff's depression and mood swings had "leveled out" once she began medication, that plaintiff was understandably "very upset" while un-

19. There was also testimony that when the parties appeared before a Parajudicial Officer for a settlement conference, he made inquiry of Senior Judge Robert C. Zampano regarding whether DCF had any jobs for plaintiff, as Judge Zampano was intimately involved in a consent decree involving DCF; plaintiff was not qualified for these openings because she did not have sufficient prior experience working with children. (Motta 6/4/96 Tr. at 5–6; Houser Tr. at 168–69).

Houser testified that at one point, DOC was considering having all objective classifications performed at the Walker facility, but later discarded that suggestion. (Houser Tr. at 68–70).

20. Houser described the location of this job for plaintiff as "[u]nusually quick," particularly "[g]iven the layoff situation and what was going on with positions in state service at that time." (Houser Tr. at 129–30).

21. Perun is the beneficiary of plaintiffs life insurance policy; Perun was not aware of that fact. (Exh. B; Motta 5/29/96 Tr. at 132–34; Perun Tr. at 13).

dergoing medical treatments for her AVM but that the prospect of returning to work resulted in "[a] 180 degree turn. She was ecstatic. She was just full of life. That meant ... everything to her, that ... was going to help her get her life back together, give her some meaning," and she was "[v]ery happy." (Perun Tr. at 2, 4–5, 12–13). When the DOC would not allow her to return, plaintiff's emotional state "quickly went down hill. It was not the Elaine I knew, very despondent, withdrawn, sleeping during the day or just laying in bed not really wanting to do anything." (Perun Tr. at 5). Perun became concerned that Motta might be suicidal. (Perun Tr. at 5). While she was working as a clerk at HCC, Perun observed that plaintiff "became angry," felt as if she had been "demoted" and "demeaned." (Perun Tr. at 5). Perun testified that plaintiff is capable of running and has resumed all physical activities without limitations. (Perun Tr. at 5, 10–12).

Plaintiff's mother, Lorraine Turner, testified in a similar fashion.[22] Turner testified that prior to the AVM, plaintiff was an outgoing, sports-oriented individual, and that during her illness and rehabilitation, it was plaintiff who gave her mother strength. Turner also observed that after September 27, 1993, plaintiff's emotional state declined dramatically—she wanted "nothing to do with life," and instead napped all day on her couch. Since October 1, 1993, Turner has witnessed her daughter walking without assistance, climbing stairs without assistance, riding a bicycle, and running in a "gimpy" fashion with her sister. She also testified that plaintiff has gone tubing and skiing, as a part of her activities at Gaylord Hospital.

## II. CONCLUSIONS OF LAW

The following constitutes the court's conclusions of law, pursuant to Fed.R.Civ.P. 52(a):

■ The Rehabilitation Act was intended to prohibit federally funded state programs from discriminating against disabled individ-

uals solely because of their disabilities. Section 794(a) of the Act states in pertinent part:

No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

Only those individuals who are both disabled "*and* otherwise qualified are eligible for relief" under the Act. *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 285, 107 S.Ct. 1123, 1129–30, 94 L.Ed.2d 307, *reh. denied*, 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987)(emphasis in original); *Gilbert v. Frank*, 949 F.2d 637, 640–41 (2d Cir.1991). To establish her *prima facie* case, plaintiff bears the burden of proving that she was (1) an "individual with a disability" within the meaning of the Act; (2) "otherwise qualified" to perform the position in question; (3) excluded from the position due to her disability; and (4) that her employer received federal financial assistance. *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir.1996); *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir.1995); *Gilbert*, 949 F.2d at 640; *Hernandez v. City of Hartford*, 959 F.Supp. 125, 128–29 (D.Conn.1997)(Dorsey, C.J.); *Kuntz v. City of New Haven*, 1993 WL 276945, at *10 (D.Conn. Mar.3, 1993)(Margolis, M.J.), *aff'd mem.*, 29 F.3d 622 (2d Cir.), *cert. denied*, 513 U.S. 1058, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994). Without proof of all four elements, the claim necessarily fails. *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir.1994), *cert. denied*, 515 U.S. 1123, 115 S.Ct. 2279, 132 L.Ed.2d 283 (1995). The parties do not dispute that DOC receives federal funds. (*See* Ruling on Motion for Summary Judgment, filed December 1, 1995 (Dkt.# 39), at 4). Therefore, the court need only consider the first three elements.

### A. WAS PLAINTIFF AN INDIVIDUAL WITH A DISABILITY?

Section 706(8)(B) of the Act defines the term "individual with a disability" as "any

---

**22.** As previously mentioned, *see* note 2 *supra,* the parties did not request a transcript of Turner's     brief testimony.

person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." Courts rarely discuss whether a person is an individual with a disability as defined by the Act as "this issue usually requires little analysis." *Daley v. Koch*, 892 F.2d 212, 215 (2d Cir.1989). Where an analysis of this issue is necessary, "the regulations promulgated by the Department of Health and Human Services are of significant assistance." *Arline*, 480 U.S. at 279, 107 S.Ct. at 1127. These regulations define, in pertinent part, a physical impairment as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal...." 45 C.F.R. § 84.3(j)(2)(i)(A) (1994). "Major life activities" are defined by the regulations as "functions such as caring for one's self, performing manual tasks, walking ... and working." 45 C.F.R. § 84.3(j)(2)(ii)(1994).

■ Plaintiff claims that she is an individual with a disability because "her total left foot drop, which makes it virtually impossible for her to walk without a brace, significantly ... impairs her ability to walk without the brace." (Dkt. # 72, at 8). There is no dispute that plaintiff can ambulate if she uses a dorsiflexion splint on her left leg to correct this total foot drop. Defendant argues that she cannot rely on this condition because she still has the ability to walk with the assistance of this orthotic device. (Dkt. # 65, at 7–8). "The determination of whether a condition constitutes an impairment must be made without regard to mitigation measures. 29 C.F.R. pt. 1630 app. § 1630.2(h). The availability of ... auxiliary aids ... to alleviate the effects of a condition has no bearing on whether the condition is an impairment. It is the scope ... of the condition itself, not its origin or capacity for being corrected, that determines whether a particular condition is an impairment." *E.E.O.C. Compliance Manual* § 902.5. *See also Gilbert*, 949 F.2d at 637 (holding plaintiff with kidney disease to be an "individual with a disability" notwithstanding that the disease was adequately treated through dialysis). Therefore, it is clear that

plaintiff is a person with a disability as it relates to the major life activity of walking. This holding is consistent with this court's previous ruling on defendant's motion for summary judgment, filed December 1, 1995 (Dkt.# 39)(Motta's "physiological disorder, an arteriovenous malformation of the spine, has affected her neurological and musculoskeletal systems. As a result of this condition, plaintiff is inhibited in her ability to walk ...").

Defendant alternatively argues that plaintiff is not an individual with a disability because her condition does not impair the major life activity of working. While not necessary to this decision, the court addresses defendant's argument in turn. Plaintiff continues to have a limp, described as "noticeable" by Warden Rowan and "pronounced" by Dr. Stahl. She is able to negotiate stairs, although there is conflicting opinion as to how quickly she could do this in an emergency situation—Dr. Stahl opining that plaintiff would have difficulty at rapid speeds and plaintiff testifying that she had no difficulty when a fire drill occurred while she was employed at MacDougall. There was similarly conflicting testimony about plaintiff's ability to run, with Dr. Stahl being skeptical, and plaintiff, Perun, and Turner all testifying emphatically that plaintiff was capable of running. Plaintiff complained of weakness in both legs as recently as two weeks prior to trial.

29 C.F.R. § 1630.2(j)(3)(I) provides in pertinent part:

> With respect to the major life activity of working[,] ... [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*See also Wernick*, 91 F.3d at 383–84 (multiple citations omitted). A similar issue arose two years ago in *Venclauskas v. Connecticut Department of Public Safety*, 921 F.Supp. 78

(D.Conn.1995)(Covello, J.), regarding an applicant's rejection as a State Trooper because of his unaided visual acuity of 20/120 and 20/80. The Court held that plaintiff was not "disabled" for purposes of the Rehabilitation Act and the Americans with Disabilities Act ["ADA"], 29 U.S.C. § 12101 *et seq.*: "The plaintiff's visual acuity does not substantially limit his ability to work, or even his ability to work in his chosen field of law enforcement. Rather, the plaintiff is foreclosed from employment within the narrow field of Connecticut state police law enforcement." *Id.* at 82.[23] The same conclusion was reached last year in *Burke v. Commonwealth of Virginia,* 938 F.Supp. 320, 322–23 (E.D.Va.1996), with respect to a correctional officer who after his employment discovered that he suffered from "a mild form of dyslexia," as well as Attention Deficit and Hyperactivity Disorder. *Cf. Johnson v. State of Maryland,* 940 F.Supp. 873, 877 (D.Md.1996)(assuming only for the limited purposes of defendant's motion for summary judgment that correctional officer who suffered from Charcot–Marie–Tooth disease, which caused him to walk with a limp, was disabled for purposes of the ADA).

■ Thus, it does not appear that plaintiff is an "individual with a disability" as it relates to the loss of the major life activity of working. She is merely unable to perform a single, particular job, *i.e.,* a counselor in a prison setting. However, since her physical impairment, without consideration of mitigating measures, severely limits her ability to walk, plaintiff is considered an "individual with a disability."

### B. WAS PLAINTIFF OTHERWISE QUALIFIED FOR THE CRSO POSITION?

■ The U.S. Supreme Court has ruled that " '[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap.' " *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17, *citing Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979); *Teahan v.*

*Metro–North Commuter Railroad Co.,* 80 F.3d 50, 53 (2d Cir.1996); *Gilbert,* 949 F.2d at 641. In the employment context, an individual is " 'otherwise qualified' only if she can perform the essential functions of her job with or without reasonable accommodation." 45 C.F.R. § 84.3(k)(1) (1994); *Teahan,* 80 F.3d at 53–54; *Borkowski,* 63 F.3d at 135, 137 (*citing Arline* ). A two-part analysis is necessary to determine whether a plaintiff is "otherwise qualified"—first, the court must determine the essential functions of the job and second, it must consider whether a plaintiff can perform those essential functions, with reasonable accommodations if necessary. *Gilbert,* 949 F.2d at 642; *Kuntz,* 1993 WL 276945, at *11. The Supreme Court in *Arline* explained:

> To answer this question in most cases, the district court will need to conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations, based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks.

480 U.S. at 287, 107 S.Ct. at 1130–31. *See also Gilbert,* 949 F.2d at 641; *Kuntz,* 1993 WL 276945, at *11.

As the Second Circuit summarized two years ago in *Borkowski:*

> [T]he plaintiff bears the burden of production and persuasion on the issue of whether she is otherwise qualified for the job in question. A plaintiff cannot be considered "otherwise qualified" unless she is able, with or without assistance, to perform the essential functions of the job in question. It follows that the plaintiff bears the burden of proving either that she can meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential function.
>
> . . .

---

**23.** Judge Covello observed that the definition of an "individual with a disability" under the ADA is "virtually identical" to the definition of "individual with a handicap" under the Rehabilitation Act, and that Congress intended that the relevant case law developed under the Rehabilitation Act should be "generally applicable" to the term "disability" as used in the ADA. *Id.* at 81 n. 1.

As to the requirement that an accommodation be reasonable, we have held that the plaintiff bears only a burden of production. This burden, we have said, is not a heavy one. It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed the benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.

At this point the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship. For in practice meeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship amount to the same.

63 F.3d at 137–39 (multiple citations omitted).

With respect to "essential functions," *Borkowski* instructs that "Section 504 does not permit [a court] to rely on intuition—indeed, unthinking reliance on intuition about the methods by which jobs are to be performed and how an individual's disabilities relate to those methods is among the barriers that the Rehabilitation Act was designed to overcome." *Id.* at 140 (citation omitted). The Second Circuit continued, "To avoid unfounded reliance on uninformed assumptions, the identification of the essential functions of a job requires a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Id.* (citation omitted). *See also Kuntz,* 1993 WL 276945, at *12–15.

Defendant's job description for a CRSO I, effective on June 4, 1991 (Exh. E) specifically provided that among a correctional counselor's many duties, he or she may be called upon to "physically restrain inmates, quell disturbances and otherwise assist security forces in emergencies." The "working conditions" include the risk that a CRSO I "may be exposed to a considerable degree of danger of injury or assault by inmates." There is no dispute that CRSO I's are hazardous duty employees, under Connecticut statutes and various collective bargaining agreements, and plaintiff agreed that prisons "usually" are unpredictably dangerous places.

■ Plaintiff and Sister Donna both agreed that meeting face-to-face with inmates is an essential element of being a correctional counselor. Plaintiff testified that during her career as a CRSO I, she never restrained an inmate, was never physically attacked by an inmate, and never saw or heard of another counselor physically attacked or in a physical confrontation with an inmate. Other counselors, however, have not been as fortunate. Sister Donna testified that on three occasions, she was required to physically restrain inmates involved in an altercation or during a riot situation; she also testified that she had been threatened by inmates on three separate occasions. Houser testified as to the various incidents involving correctional counselors at other facilities. (*See also* Exhs. 17–18). Sister Donna also testified there could be as many as thirty to fifty inmates in the counseling area of HCC, without a correctional officer present. Sister Donna further estimated that as much as ninety to ninety-five percent of a counselor's contacts with inmates takes place outside the presence of correctional officers. Plaintiff's testimony notwithstanding, the DOC witnesses were consistent that when an "all available call" is sounded, which happens fairly frequently, all hazardous duty employees, which includes correctional counselors, are to respond. Thus, meeting directly with inmates, and the dangers and responsibilities attendant thereto, clearly is an "essential function" of a CRSO I.

Similar issues were addressed last year in *Barnfield v. State of New Hampshire,* 1996 WL 679398 (D.N.H. Sept.30, 1996), in which the plaintiff had been employed for three years as a remedial teacher at the Youth Development Center ["YDC"], a state correctional facility for juvenile delinquents. The formal job description included the maintenance of security and appropriate intervention in possible escapes, assault, or self-injury, for the protection of institution residents,

staff, and the community. Plaintiff shared responsibility for security with a teacher's aide, who was always present in the classroom, and with cottage counselors, who were always nearby but not necessarily in plaintiff's classroom. On two occasions, plaintiff physically restrained students with the help of the teacher's aide, until the cottage counselors arrived. On other occasions, plaintiff positioned himself between combative students to segregate them. The plaintiff severely injured his back at school, requiring surgery. Upon the advice of his physician, he did not return to school for more than one year. Just like the situation here, plaintiff's doctor prepared a medical report which approved plaintiff's return to YDC, provided he "not be the physical disciplinarian of challenging, resistive, or combative teenagers." Defendant thereafter terminated plaintiff.

Like plaintiff here, Barnfield argued that security was not an "essential function" of his teaching position, because that was the reason for the presence of the teacher's aide and the nearby cottage counselors, and because he had spent so little time in restraining students (twice in three years). The district court disagreed, granting summary judgment for defendant, because it found that the ability to restrain juveniles was an essential function of the job of remedial teacher at YDC: "The ability to restrain students promotes the safety of everyone at ... YDC, and the concomitant deterrent effect implied in such an ability has a salutary effect on classroom discipline by deterring juveniles who might otherwise require physical restraint." *Id.* at 6.

The same conclusion was reached, also last year, in *Hardy v. Village of Piermont. N.Y.*, 923 F.Supp. 604 (S.D.N.Y.1996), involving a tenured police officer developed necrosis in her tibias as a result of corticosteroid medication she was taking for a gastrointestinal disorder. As a result of this necrosis, her tibias had weakened to such a degree that they could fracture or shatter under the stress of running or prolonged walking. Plaintiff's request for a permanent light duty assignment was refused on the ground that no such assignment was available in the police department. In granting summary judgment for defendant, the court held that there is no dispute that the duties of a police officer require at times walking long distances or running. *Id.* at 609–10 & n. 1. *See also Mitchell v. Crowell*, 966 F.Supp. 1071, 1078–80, 1074 (N.D.Ala.1996)(essential function of a security officer at nuclear plant is protecting facility, which could not be performed by plaintiff who suffered from "[b]ipolar disorder, maniac, severe with psychotic symptoms," as a result of combination of antidepressive medication and allergy medication, prescribed by two different doctors).

Plaintiff does not dispute that she can perform this "essential function" only with accommodations. The body alarms, provided by correctional officers in the "inside" or those effective only in the counseling area, are not substitutes for plaintiff's ability to protect herself, by running or walking quickly, if necessary.

## C. CAN DEFENDANT REASONABLY ACCOMMODATE PLAINTIFF?

■■■ As the Second Circuit observed last year in *Wernick*, "[w]hether or not something constitutes a reasonable accommodation is necessarily fact-specific. Therefore, determinations on this issue must be made on a case-by-case basis." 91 F.3d at 385 (*citing Borkowski*, 63 F.3d at 138). In *Borkowski*, the Second Circuit explained:

> "Reasonable" is a relative term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires an inquiry not only into the benefits of the accommodation but into its costs as well.... [A]n accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce.

63 F.3d at 138 (citation omitted). *See also Kuntz*, 1993 WL 276945, at *16. Minor readjustments which do not create an undue hardship to an employer are deemed "reasonable." *Kuntz*, 1993 WL 276945, at *16 (citation omitted). Accommodation may include "job restructuring." 34 C.F.R. § 104.12(b); 45 C.F.R. § 84.12(b). However, an accommodation is unreasonable if it requires elimination of an essential duty. *Her-*

*nandez,* 959 F.Supp. 125, 131–32; *Johnson,* 940 F.Supp. at 878; *Hardy,* 923 F.Supp. at 610. In addition, "[q]uestions of safety are legitimate concerns for an employer, particularly where 'public safety concerns' are raised." Kuntz, 1993 WL 276945, at *17 (multiple citations omitted). However, "[t]he safety defense has been given narrow scope. It must be tailored to the individual characteristics of the employee in relation to specific, legitimate job requirements. The risk of injury to the employee must be imminent and substantial, and the mere possibility of future injury is not sufficient." *Ackerman v. Western Elec. Co., Inc.,* 643 F.Supp. 836, 848 (N.D.Cal.1986)(multiple citations omitted)(construing California law), *aff'd,* 860 F.2d 1514 (9th Cir.1988).

■ Plaintiff has proposed a number of accommodations, including that she be assigned to housing units on the first floor of HCC, or that she work primarily within the administrative areas, concentrating upon objective classifications. Houser testified that of the approximately 350 correctional counselors employed by DOC, all of them had inmate contact. According to Warden Rowan and Semple, a person could not perform the job of a CRSO without direct inmate contact. As to the first suggestion, it is clear that such a suggestion is not "reasonable," given her limitations. As to the second suggestion, plaintiff was permitted to have such a "recuperative" position in March 1993, along with another employee, Richard Yolken, who was wearing a neck brace at the time. As Houser testified, a DOC employee may remain in a "recuperative post" for no more than ninety days. Houser testified that it is theoretically feasible to have a CRSO I perform only objective classifications, as such a decision is left to the sound discretion of each warden in making employment assignments within a prison. However, even if plaintiff were given such an assignment, she still would be in daily contact with inmates. First, as Sister Donna testified, under an Administrative Directive, inmates are required to sign a form acknowledging placement at a facility of a specific level, due to his or her factors. Second, from time to time, there are inmates present in the administrative areas, as recognized by plaintiff, al-

though Warden Rowan conceded that she was not aware of any violent incident having occurred in the front office of HCC.

Houser estimated that approximately four to six DOC employees each year are not allowed to return to hazardous duty work because of permanent injury or medical condition. Of the approximately 7,500 DOC employees, about four-fifths of them are considered hazardous duty employees. Houser and Sullivan both testified that DOC has never accommodated a hazardous duty employee or permitted a hazardous duty employee to return to permanent employment with physical limitations. However, there was testimony to the contrary. W, a CRSO at MacDougall, is able to run daily, and walks with a "strut," rather than a limp. S, a correctional officer at HCC, suffers from weakness in his dominant right arm, but uses an electrical device to stimulate his arm when this situation occurs. Houser also testified as to at least three other DOC employees in hazardous duty positions with impairments of their limbs—a male employee with a prosthetic arm, a counselor supervisor or deputy warden (who has since retired) with a prosthetic leg, and a correctional commissary operator with a prosthetic leg.

The question here is not whether it is theoretically possible for DOC to accommodate plaintiff. The answer to that question is clearly "yes," for, as Houser acknowledged, a warden may exercise his or her discretion to assign a CRSO to administrative duties only. Plaintiff testified that there were two CRSO's at HCC whose primary assignments were the preparation of objective classifications—Michael Carter and Sister Donna, although Sister Donna's estimate as to how much time she spent on administrative matters was substantially lower than plaintiff's perception. Houser testified that at one point, DOC was considering having all objective classifications performed at one facility, but later discarded that suggestion.

The question instead, under the Rehabilitation Act, is whether the accommodation would be "reasonable," and the answer to that question, unfortunately, is "no." As indicated above, even such a limited assign-

ment would not adequately insulate plaintiff from exposure to inmates, who can unpredictably pose danger to plaintiff, her co-employees, and other inmates, even in the administrative offices of a prison. The threat is far from remote—it is not a "mere possibility," but instead is "imminent and substantial." *Ackerman,* 643 F.Supp. at 848.

The *Johnson, Barnfield,* and *Hardy* decisions are consistent. As previously mentioned, the plaintiff in *Johnson* was a correctional officer who developed a neuromuscular disorder, which caused him to walk with a limp and to have tremors in his arms. The defendant-corrections department required all correctional officers to be proficient in the use of firearms in case of emergencies. Plaintiff had requested light duty status in which he was not required to use a weapon. The district court granted summary judgment for defendant:

> Johnson's inability to use a firearm to help control the prison population poses a direct threat to the safety of other Correctional Officers and the public at large. Therefore, the Court concludes that the limited duty accommodation suggested by Johnson is not reasonable under the circumstances....

940 F.Supp. at 878 (citation omitted). The same conclusion was reached in *Barnfield,* where the plaintiff-teacher had suggested that all security functions be assumed by the teacher's aide and cottage counselors, 1996 WL 679398, at *6–7, and in *Hardy,* where the plaintiff-police officer requested that she be placed in a light duty position where she was not required to walk or run, 923 F.Supp. at 610–11.

Plaintiff is truly an admirable person, who has overcome overwhelming adversity. As her mother testified, during her prolonged ordeal, it was plaintiff who gave Turner emotional strength. Dr. Stein is correct that plaintiff's recovery was "amazing," particu-

larly given the nature and rarity of her illness. Plaintiff's passion for her job as a CRSO was reflected in her poignant testimony:

> I really wanted to be Counselor Motta again. I missed the people that I worked with. I missed the inmates. I missed the satisfaction that I got from seeing my inmates and having them ask me a zillion different things, and I gave them all the answers on that day. That was what made me happy.

(Motta 5/28/96 Tr. at 67). However, under the standards set forth in *Borkowski,* 63 F.3d at 137–39, defendant has sustained his burden that plaintiff's suggested accommodations are unreasonable and would cause defendant to suffer an undue hardship, one which could jeopardize the safety of plaintiff herself, her co-workers, and the inmates at whichever facility to which plaintiff were assigned. Over time, if DOC had so desired, it might have been able to find a position for her. Fortunately, from everyone's perspective, within nine months, an "[u]nusually quick" time, plaintiff found a substitute position, as a social worker for DAS, a position which she "loves." [24] Despite plaintiff's indefatigable determination, for which she is to be commended and admired, the Rehabilitation Act does not compel her return to her previous position as a CRSO I, with the unreasonable accommodation plaintiff suggested.[25]

## III. CONCLUSION

Accordingly, for the reasons stated above, judgment shall enter for defendant.

---

**24.** The Court is impressed with the substantial efforts made by Talbert, Sullivan, Scott, and Houser to find alternative suitable employment for plaintiff.

**25.** The Court is left with the uncomfortable impression that plaintiff was, however, "singled out" among impaired DOC employees, given de-

fendant's willingness to overlook the handicap of several other employees, all of whom were male. At the trial, there were some witnesses who exhibited obvious hostility toward plaintiff. The Court hopes that such hostility does not arise from narrow-minded prejudice.